IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| GLOBAL MINERALS ) | |
| CORPORATION, ) | |
| ) | |
| Plaintiff; ) | |
| ) | |
| vs. ) | 7:10-cv-2095-LSC |
| ) | |
| NUCOR STEEL TUSCALOOSA ) | |
| INC., and NUCOR CORPORATION, ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM OF OPINION

**I. Introduction**

The Court has before it cross-motions for Summary Judgment from the Plaintiff, Global Minerals Corporation ("Global") and Defendants Nucor Steel Tuscaloosa, Inc. ("NSTI") and Nucor Corporation ("Nucor"). Plaintiff originally alleged six claims for relief, all arising out of a commercial relationship with NSTI: breach of contract, breach of the covenant of good faith and fair dealing, breach of implied-in-fact contract, intentional misrepresentation, negligent misrepresentation, and a claim that Nucor, NSTI's parent company, should be liable for NSTI's actions. (Doc. 1 at 8-14.) Defendants then moved to dismiss all of these claims under Rule

12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 31.) This Court dismissed Plaintiff's claims for breach of implied-in-fact contract and breach of the covenant of good faith and fair dealing. (Doc. 47.) This ruling left before the court Plaintiff's misrepresentation and breach of contract claims, as well as the claim against Nucor. (Doc. 47). Subsequent to the partial dismissal, however, Global filed an Amended Complaint that omitted not only the dismissed claims but also the misrepresentation claims. (Doc. 59.) Therefore, only the breach of contract claim and the claim against Nucor remain before the Court. *See In re Bayshore Ford Truck Sellers, Inc.*, 471 F.3d. 1233, 1241 (11th Cir. 2006) (describing the claims mentioned in the Amended Complaint as the only operative claims, where there was no formal dismissal of the omitted claims).  Because the Court holds today that no breach of contract occurred, the question of whether Nucor may be liable for any such breach need not be reached. *See Watson v. Drummond Co.*, 436 F.3d. 1310, 1311 n.1 (11th Cir. 2006) (describing the issue of whether a national union would be liable for the actions of local affiliates as moot, when the court found no liability for the local affiliates).

## II.  Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d

1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

The fact that there are cross-motions for summary judgment in this particular case does not change this basic standard. Even though both sides allege that no genuine issue of material fact exists, the Court must still evaluate each motion under the Rule 56 standard, determining whether either party has established that it is entitled to judgment as a matter of law. *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d. 338, 345 (5th Cir. 1955). The Court has considered each motion in the light most favorable to the opposing party in order to determine whether the Rule 56 standard has been met. *See Mize*, 93 F.3d at 742.

## III.  Facts

Although each party debates their legal significance, none of the following facts are genuinely disputed. Nucor is the largest steel producer in the United States and owns NSTI, which manufactures steel products at a plant in Tuscaloosa, Alabama. In the manufacture of these products, NSTI uses a mineral called ferrosilicon. Global purchases ferrosilicon and sells it to manufacturers like NSTI.

In early 2008, the price for ferrosilicon was rising, and NSTI sought new sources of the mineral, requesting price quotes from Global and other suppliers. Since

the two companies had not worked together previously, in March of 2008 they concluded an agreement for a trial order. This is the first of three purchase orders that form the basis of the current dispute. The March 2008 purchase order states a dollar amount that the order is "not to exceed" and sets out the following with regard to quantity:

> 100 net tons of product during the fourth quarter of 2008 (October through December). This represents a trial quantity of product. NSTI makes no committment [sic] or guarantee with regard to the actual quantity of product released under this purchase order, however, shall not exceed 100 net tons without agreement with Global Minerals.

(Doc. 1-1 at 1.) On June 3, 2008, before delivery of any ferrosilicon under the March order, NSTI issued another purchase order, "subject to satisfactory performance of the trial material." This raised the price NSTI would pay to $1.48 per pound. (Doc. 1-2 at 1.) This document likewise contained a dollar amount that the order was "not to exceed" and set out the following regarding quantity:

> Quantity—600 net tons of product during the period September through December 2008. NSTI makes no commitment or guarantee with regard to the actual quantity of product released under this purchase order, however, shall not exceed 600 net tons of product without agreement with Global Minerals.

(Doc. 1-2 at 1.) The parties later substituted "metric tons" for "net tons" to match the quantities Global Minerals had purchased from its supplier. Global

procured 600 metric tons and shipped it from China, alerting NSTI upon the ferrosilicon's September 2008 arrival in New Orleans. During the late summer and fall of 2008, both the demand for steel and the price for ferrosilicon dropped precipitously. In September 2008, NSTI requested that Global adjust the $1.48 per pound price down to $1.32 per pound. Global declined. In the last quarter of 2008, NSTI took delivery of about 27 metric tons under the June 2008 purchase order.

In December of 2008, NSTI informed Global that it did not intend to purchase any further ferrosilicon under the June 2008 order. Global took the position that NSTI was obligated by the contract to purchase the full 600 tons mentioned in the order, or at least an amount "reasonably proportionate" to it. Negotiations between the parties followed, and in January of 2009, NSTI issued a third purchase order. This document attached the June 3, 2008 purchase order and added the following language:

> This change order is issued to extend the end date of this blanket purchase order to June 30, 2009, based on a sincere request from Global Minerals to do so. . . . NSTI continues to make no commitment or guarantee with regard to the actual quantity of product released under this purchase order. However, NSTI will take all of its purchase requirement during the period January through July 2009 from Global Minerals.

(Doc. 1-3 at 2.) The January 2009 purchase order also created a new pricing formula that would generally result in a lower price than NSTI had paid under the July

order, with a cap at the previous price. Although Dan Ritter of Global expressed dissatisfaction in taking a loss on the materials Global had purchased in China, he accepted the terms of the January change order. NSTI took delivery of approximately 119 metric tons from Global during the first half of 2009, while also using nearly 165 tons of ferrosilicon that had been previously purchased and warehoused at a location called Western Steel. On July 9, 2009, NSTI alerted Global that the ferrosilicon purchase order was closed.

## IV. Discussion

There are two basic issues this Court must address to resolve Global's breach of contract claim. First, it must determine whether two separate contracts exist on which Global may sue for breach. Secondly, the Court must decide whether NSTI breached either of these possible contracts. Both parties correctly stipulate that these questions will be decided under Alabama law.

### A. Number of Operative Contracts

Global insists that the June 2008 Purchase Order and the January 2009 Change Order constitute separate contracts, each obligating NSTI to purchase 600 tons of ferrosilicon or a reasonable approximation thereof. The Court cannot accept this interpretation and finds no genuine issue of material fact that the Change Order could

possibly be a new and wholly separate contract. If it was a new contract at all, it was made in settlement of a dispute over the June 2008 Purchase Order and should be considered a replacement of the contract created by that order.

A preliminary question in reaching this decision concerns whether this Court should consider evidence surrounding the creation of the Change Order, either as parol evidence, or as part of the contract by reference. In the absence of fraud or mistake, which are not alleged here, the Alabama Supreme Court has held that such evidence may be considered in two situations. First, if the contract is of doubtful meaning or contains ambiguous language or terms, parol evidence may be considered. *River Conservancy Co. v. Gulf States Paper Corp.,* 837 So. 2d. 801, 805 (Ala. 2002) ("If a court determines that a contract is ambiguous, extrinsic evidence will be allowed to clarify the contract"); *see also Chancy v. Chancy Lake Homeowners Ass'n, Inc.,* 55 So.3d 287, 295 (Ala. Civ. App. 2010). Second, if the contract incorporates outside material by reference, this becomes part of the contract and the binding agreement between the parties. *See Ex Parte Dan Tucker Auto Sales,* 718 So.2d. 33, 36 (holding the rules of the American Arbitration Association to be incorporated when an arbitration clause referenced them); *see also Advance Tank and Const. Co. v. Gulf Coast Asphalt Co.,* 968 So.2d 520, 524 (holding that an attachment detailing technical specifications

incorporated not only those specifications but also the standard terms and conditions referenced on that page). In this case, the Change Order specifically mentions a "sincere request from Global Minerals" to extend the end date on the Purchase Order. (Doc. 59-3). In addition, it later states, "This change has been confirmed with Dan Ritter . . . per e-mail proposal from Jim Yerkes to Dan Ritter dated January 9, 2009." Under Alabama precedent such as *Ex Parte Tucker*, 718 So.2d. at 36, these references allow the court to consider the incorporated material, in this case the e-mails between Ritter and Yerkes which contained both Global's "sincere request" and the specifically mentioned "proposal" e-mail. These materials become part of the contract, and the Court can examine them without a finding that the contract is ambiguous. *See Crews v. National Boat Owners Ass'n Marine Ins. Agency,* 46 So. 3d 933, 938, 941(Ala. 2010) (holding both that an arbitration agreement was incorporated by reference and that no ambiguity in the contract exists).

These e-mails unequivocally reveal a dispute over whether NSTI had breached the June 2008 contract by taking delivery of much less than 600 tons. After NSTI advised Global that it would not need any more ferrosilicon from the order in December 2008, Dan Ritter alleged that NSTI was "backing out" of the agreement, calling the refusal to take delivery of the rest of the 600 ton quantity a "cancellation

of the contract" that is "not fair to [Global]." (Doc. 67-1 at 19.) In a later e-mail, Ritter accuses NSTI of not acting in good faith, and also characterizes the 600 tons mentioned in the June P.O. as an "estimate of a certain quantity." (*Id.* at 25.) Just as clearly, NSTI argued that the June Purchase Order did not obligate it to purchase any specific amount of ferrosilicon. (*Id.* at 29.)

After each side laid out its position, Global and NSTI exchanged offers that were clearly aimed at settling the dispute. First, NSTI offered to extend the P.O. through the first half of 2009, and take its purchase requirements for that time from Global (again without any volume guarantee), at a price lower than the previously contracted price but above market value. (*Id.* at 28-29.) Global then presented a counteroffer that would require NSTI to take delivery of the remainder of the 600 tons, at a price closer to the original contract price than NSTI had offered. (*Id.* at 30.) When NSTI rejected this offer, Global, though still complaining about the amount of money they would lose, agreed to NSTI's offer. (*Id.* at 33). This new agreement was memorialized in the Change Order of January 15, 2009, which created the purchase requirements contract for the first half of 2009. (Doc. 1-3).

The purchase requirements contract replaced the original and should be seen as a substituted contract.[1] As the Alabama Supreme Court observed in *Safeco Ins. Co. of Am. v. Graybar Elec. Co.*, a substituted contract is one that is accepted in satisfaction of the original contract and thereby discharges it. 59 So. 3d 649, 656 (Ala. 2010). The Alabama Supreme Court has also held that "whether there has been a substituted contract depends on the intentions of the parties, which may be determined by the facts and circumstances." *Id.* at 657. In addition, that court has consistently held that privately-reached settlements of disputes are to be favored and encouraged by the courts. *See Maddox v. Druid City Hospital Bd.,* 357 So. 2d. 974 (Ala. 1978); *Cook v. Trinity Universal of Kan.,* 584 So. 2d. 813 (Ala. 1991). No matter what the parties argue today, the evidence surrounding the negotiations makes it clear that there was a substituted contract and that its terms are embodied in the Change Order of January 2009. For the Court (or a rational jury) to believe otherwise would be to accept the implausible idea that, while the parties were clearly disputing whether there were remaining obligations under the June 2008 contract, NSTI chose to enter an entirely new contract for 600 more tons at 39 cents above market price, and that it put off a

---

[1] Such contracts are sometimes referred to as "novations" but the Alabama Supreme Court distinguished between the two in *Graybar*, declaring that a novation is a substituted contract that includes a party who had not been party to the original contract. 59 So. 3d at 656.

better deal with another supplier to do so. Such an interpretation falls short of providing any reason for a rational juror to find more than one operative contract. Therefore, the Court holds, as a matter of law, that the only remaining contract between the parties was the purchase requirements contract created by the Change Order of January 2009.

Even if the Court were to confine its analysis to the "four corners" of the January 2009 Change Order, as Global argues is proper, the conclusion would still be that the document cannot represent an entirely new contract between the parties. First, the large words "Change Order" printed across the page alert the reader that this document represents not something independent and new, but a change to an existing purchase order. In addition the body of the document begins with the word "Addendum" and the date. Further, the language of the Order itself declares that it extends the date of "this blanket purchase order" to June 30, 2009. If the Change Order were an entirely new contract, there would be nothing to extend, so "this blanket purchase order" must refer to the June 2008 Purchase Order, which, in fact, is reprinted below the Change Order terms. This conclusion is also bolstered by the fact that the Change Order has the same number as the earlier Purchase Order. On its face, the Change Order does not even purport to be a new contract between the

parties, but to change the old.² The only question, therefore, would be whether it is a modification or a substituted contract, which would require examining the circumstances surrounding the creation of the contract, as is discussed above.

### B. Breach of the Requirements Contract

The remaining question, of course, is whether NSTI breached the contract created by the Change Order. Global proffers two ways that NSTI could have breached this contract. First, it argues that the Change Order, a requirements contract,³ contains an estimate of 600 tons for the quantity term, and that this estimate, under Alabama law, obligates NSTI to purchase a quantity that is "reasonably proportionate" to that amount. (Doc. 63 at 20-21.) Under this theory, Global asserts that the actual purchase NSTI made, of only 119 tons of ferrosilicon, constituted a breach of the contract. Second, Global argues that NSTI breached the contract by taking deliveries of stored ferrosilicon, during the term of the contract, rather than buying all of its usage needs from Global. (Doc. 63 at 21.)

---

² Global's contention that the Court's previous finding that the two-contract theory was "plausible" (ruling on a Motion to Dismiss), binds the Court in any way is incorrect. The Court may reconsider rulings made denying a motion to dismiss at the summary judgment stage. *Vintilla v. U.S.*, 931 F. 2d. 1444, 1447 (11th Cir. 1991).

³ Both parties characterize the January 2009 Change Order as a requirements contract, and the Court accepts this characterization. (Doc. 63 at 15; Doc. 67 at 21.)

The issue of whether the Change Order contains an estimate requires close examination of the document itself. The main body of the Change Order is set off by a line of asterisks and printed under the words "Change Order," and this portion does not contain any reference to a quantity term. (Doc. 59, Ex. 3 at 2.) It is certainly possible to read the substituted contract as containing only the terms in this section, with the contract being replaced simply reprinted below it. This would mean that it was a bare requirements contract with no estimate at all, and this would decide the issue in NSTI's favor. While this Court is inclined to agree with this reading of the contract, it also notes that the "Addendum" section, above the one labeled "Change Order," states that this purchase order is "not to exceed 1,350,000." (*Id.*) Therefore, further analysis is needed in order to determine whether it could be reasonably construed as an estimate.[4]

In addition, the full text of the June 2008 Purchase Order is reprinted following the new terms, including the discussion of quantity. This section includes language stating that NSTI makes no commitment as to quantity and that the total quantity "shall not exceed" 600 tons without permission from Global. (*Id.*) Whether this

---

[4] The variable nature of the price term makes it difficult to know exactly what any estimate arrived at using this number would be, but the analysis below renders this a moot point.

quantity term should be seen as an estimate can be discussed in the same fashion as the price term.

Plaintiff relies heavily on *Simcala, Inc. v. Am. Coal Trade, Inc.*, in which the Alabama Supreme Court ruled that when an estimate is given, the purchase of an amount unreasonably disproportionate to that estimate constitutes a breach of contract, whether the disproportionate amount is higher or lower than the estimate. 821 So. 2d. 197, 203 (Ala. 2001). That decision turned on the interpretation of § 7-2-306(1) of the Alabama Code, which forbids a party to a requirements contract from taking an unreasonably disproportionate quantity, without reference to whether it is higher or lower. ALA. CODE § 7-2-306(1).

This section codifies a portion of the Uniform Commercial Code, and the Alabama Supreme Court recognizes the comments to the code as persuasive authority, though Alabama chose not to enact them as law. *Simcala*, 821 So. 2d. at 201. Comment 3 to the section, discussed by the court, states that any agreed maximum or minimum sets a limit to the elasticity of the quantity term, and that an estimate serves as the center around which the term could reasonably fluctuate. Uniform Commercial Code, § 7-2-306 cmt. 2. The *Simcala* Court used this to show that the statute applied both to unreasonably high quantities and unreasonably low quantities. *Simcala*, 821 So.

2d. at 201. However, comment 3 also makes clear the fact that not every quantity term in a requirements contract serves as an estimate; contracting parties are also free to negotiate and include maximum or minimum quantity terms. The plain meaning of the language at issue in this case, whether it is "shall not exceed 600 tons," or "not to exceed 1,350,000," reveals it to be a maximum term rather than an estimate. The Alabama Supreme Court has consistently held that contract terms should be given their plain ordinary meaning. *See, e.g., H & S Homes L.L.C., v. Shaner*, 940 So. 2d. 988 (Ala. 2006); *Polaris Sales, Inc. v. Heritage Imports, Inc.*, 879 So. 2d. 1129, 1133 (Ala. 2003); *State v. Lorillard Tobacco Co.*, 1 So. 3d 1, 7 (Ala. 2008). Therefore, the maximum term in this contract does not operate as an estimate.

This conclusion is supported by a close look at the contract at issue in *Simcala* and the Alabama Supreme Court's discussion of how other jurisdictions have handled this particular issue. The contract between Simcala and ACT identified a specific tonnage as an "approximate quantity" and contained none of the disclaimers as to quantity that are present in the case at bar. *Simcala,* 821 So. 2d at 199. Whether an estimate existed was never at issue in *Simcala*, that Court merely discussed the legal effect of a term that everyone agreed was an estimate. In addition, the *Simcala* Court noted that many jurisdictions had decided similar cases the opposite way, finding that

only disproportionately higher quantities violated the statute. *Id.* at 201-02. The Alabama Court recognized solid economic reasons for these other decisions, but it felt constrained to interpret the statute according to its plain meaning, leaving any change counseled by those economic factors to the legislature. *Id.* at 202-03. Thus, the *Simcala* opinion, despite its holding, reveals some level of reluctance on the part of the Alabama Supreme Court to strictly construe estimates in requirements contracts, and makes it likely that the court would be careful in defining a contract term as an estimate.

Since no term in the contract operates as an estimate, the Court must next examine whether NSTI's actions could constitute a breach of a requirements contract without an estimate. The comments to § 2-306 shed light on this subject as well. Comment 2 addresses the situation of a requirements contract that does not include an estimate, stating that "good faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance." Uniform Commercial Code, § 2-306, cmt. 2. This means that, in the absence of an estimate, the buyer may reduce his purchases to zero, if such reduction occurs in good faith. To illustrate good faith, the comment points out that a discontinuance due to a lack of orders would be in good faith, whereas one done solely to minimize losses would not.

*Id.* In this case, Global presents no evidence of bad faith, and NSTI's reduction of orders occurred at a time when the global market for steel had been depressed by recession, making it very likely that the reduction was caused by a lack of orders. Therefore this Court holds that NSTI did not breach the requirements contract simply by reducing its orders for ferrosilicon.

The final issue presented in the case is whether NSTI's use of materials that it had previously purchased breached the requirements contract. Both parties agree that NSTI did receive and use approximately 165 tons of ferrosilicon from an off-site warehouse while the contract remained in effect. Global claims that the requirements contract precluded use of any materials not purchased from Global while the contract was in effect, including material from other suppliers that had already been warehoused by NSTI. (Doc. 63 at 21.) This precise issue does not seem to have come before the Alabama Supreme Court, but it can be resolved by examining the plain meaning of the contract.

The requirements contract embodied by the Change Order stated that "NSTI will take all of its *purchase requirement* during the period January through July 2009 from Global Minerals." (Doc. 59, Ex. 3 (emphasis added.)) Thus, the plain meaning of the contract is that NSTI promised not to purchase ferrosilicon from other

suppliers during the contract period. Global does not allege that NSTI did purchase ferrosilicon elsewhere, merely that it made use of what it already owned (previously-purchased ferrosilicon) in such a way that reduced the purchase requirement. If NSTI had agreed to buy all of its ferrosilicon "requirements" from Global, and then had used its own ferrosilicon, this would present a closer case in which this court would have to parse the meaning of the word "requirements." But the parties have already done this work by using the term "purchase requirements." The plain meaning rule followed by the Alabama Supreme Court (*See, e.g., Polaris Sales*, 879 So. 2d at 1133) requires that this Court give the ordinary meaning to each contract term. Therefore, "purchase requirements" must necessarily mean some subset of NSTI's total requirements. Global should have either known that purchase requirements meant purchase requirements, or it should have inquired more closely. Since NSTI did not purchase ferrosilicon from other suppliers during the contract period, it did not breach its promise to obtain its "purchase requirements" from Global.

## V. Conclusion

The evidence in this case demonstrates, as a matter of law, that a single operative contract existed between Global and NSTI, embodied in the Change Order of January 2009. This is true whether the Court examines the e-mail negotiations

leading to the Change Order or confines itself to the "four corners" of the document. It is likewise clear, as a matter of law, that this single contract was not breached by NSTI. Therefore Summary Judgment is appropriate in this case, and is due to be granted for Defendants.

    Done this <u>21st</u> day of <u>March 2012</u>.

                                          L. SCOTT COOGLER
                          UNITED STATES DISTRICT JUDGE
                                                                       [167037]